ASSOCIATION FOR DISABLED AMERICANS, INC.; Daniel Ruiz; Jorge Luis Rodriguez, Plaintiffs,

v.

INTEGRA RESORT MANAGEMENT, INC.; Enclave Resort Hotel, L.L.C., d/b/a The Enclave, Defendants.

Access For America, Inc.; Doug Wilder, Plaintiffs,

v.

The Enclave at Orlando Condominium Association, Inc., Defendant.

Disability Advocates And Counseling Group, Inc., Jorge Luis Rodriguez, and Steven Brother, Plaintiffs,

v.

**The Enclave at Orlando Condominium Association, Inc., Defendant.**

Nos. 602CV917ORL31JGG,
603CV264ORL31JGG,
603CV1294ORL31JGG.

United States District Court,
M.D. Florida,
Orlando Division.

Aug. 2, 2005.

Lori I. Barkus, Charouhis & Associates, LLP, Miami, FL, James Vincent Johnstone, Law Offices of James Johnstone, Ft. Lauderdale, FL, William Nicholas Charouhis, William N. Charouhis & Associates, P.A., Miami, FL, for Plaintiffs.

James Everett Shepherd, V, Teresa N. Phillips, Pohl & Short, P.A., Winter Park, FL, for Defendants.

### MEMORANDUM OF DECISION

GLAZEBROOK, United States Magistrate Judge.

Following the settlement of these consolidated ADA Title III premises liability cases, Plaintiffs demanded $147,366.30 in attorneys fees, litigation expenses, and costs. Docket No. 61 at 21. Defendants opposed the amount sought as excessive, but conceded that $20,686.30 was reasonable. Docket No. 69. On February 26, 2004, the undersigned entered a cursory order finding Plaintiffs' demand for $147,366.30 "entirely unreasonable," but finding Defendants' response thorough and well-reasoned. Docket No. 71 at 2. The Court entered a judgment in favor of Plaintiffs for attorney's fees, expenses, and costs, but only to the extent conceded by the defendants. Docket No. 71.

Plaintiffs then appealed the award as insufficient. Docket No. 73. The United States Court of Appeals for the Eleventh Circuit remanded the case for the undersigned to articulate the basis for the award so as to permit meaningful review. *Association for Disabled Americans, Inc. v. Integra Resort Management, Inc.*, 387 F.3d 1241 (11th Cir.2004). The Court of Appeals returned the record and issued the decision as a mandate on March 3, 2005, Docket Nos. 96, 98, and the case is now ripe for decision. This Court's order of February 26, 2004 [Docket No. 71] and judgment on attorney's fees of February

27, 2004 [Docket No. 72] are VACATED, and this memorandum of decision is substituted in their place.

## I. THE ISSUES

First, this memorandum of decision articulates the basis for the original decision, and shows the hourly rate calculations used. 387 F.3d at 1243. This substituted decision sets forth the amount of reasonable attorneys' fees, litigation expenses, expert fees, and costs incurred in this matter that defendants agreed to pay to plaintiff's counsel pursuant to the consent decree. Docket No. 59 at 45; Docket No. 60 at 2.

Second, this order and memorandum of decision raises *sua sponte* an important issue which the undersigned failed to address in its original decision—an issue which no party has briefed or even raised. The Court must assure itself that a genuine case or controversy exists—in other words, that plaintiffs have standing to seek injunctive relief for a real and immediate threat of injury—and that this Court has subject matter jurisdiction to enter a judgment for attorney's fees, expenses, expert fees, and costs.

## II. THE LAW

### A. STANDING

■ Article III, § 2 of the United States Constitution limits federal jurisdiction to actual cases or controversies. A federal court therefore has an obligation to assure itself that a litigant who seeks an injunction has Article III standing at the outset of the litigation. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 179—80, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (initial standing simply assumed but not decided).

The standing doctrine ensures that the "scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." 528 U.S. at 191, 120 S.Ct. 693. A party has standing to seek injunctive relief only if the threat of injury is both real and immediate, and not abstract, conjectural, or hypothetical.[1] *City of Los Angeles v. Lyons,* 461 U.S. 95, 101—02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *accord, Shotz v. Cates,* 256 F.3d 1077, 1082 (11th Cir.2001).

■ To satisfy Article III's standing requirements, a plaintiff must show 1.) it has suffered an "injury in fact" that is a.) concrete and particularized and b.) actual or imminent, not conjectural or hypothetical; 2.) the injury is fairly traceable to the challenged action of the defendant; and 3.) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *accord, Shotz v. Cates,* 256 F.3d 1077, 1081 (11th Cir.2001) (these requirements are the "irreducible minimum" required to proceed in federal court). An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Friends of the Earth,* 528 U.S. at 181, 120 S.Ct. 693.

A plaintiff may have standing, for example, to enjoin toxic discharges into a near-

---

**1.** Of course, a litigant might also have a claim for damages that *does* meet the requirements of Article III. *See City of Los Angeles v. Lyons,* 461 U.S. at 109—10, 103 S.Ct. 1660 (plaintiff who had been strangled by police could seek damages even though injunction was unavailable for lack of a real or immediate threat that plaintiff would again be strangled).

by river that he would use for recreation if it were not polluted. *Friends of the Earth*, 528 U.S. at 184, 120 S.Ct. 693 (seeking to enjoin toxic discharges that directly affect plaintiffs' recreational, aesthetic, and economic interests). In contrast, litigants may not base Article III standing on mere "general averments" and "conclusory allegations," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), or on speculative "some day" intentions to visit endangered species halfway around the world, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *See Friends of the Earth*, 528 U.S. at 184, 120 S.Ct. 693.

■ An ADA plaintiff therefore lacks standing to seek an injunction unless he alleges facts giving rise to an inference that he will suffer future discrimination by the defendant. *Shotz v. Cates*, 256 F.3d at 1081. In *Shotz*, the United States Court of Appeals for the Eleventh Circuit determined that ADA plaintiffs lacked Article III standing to seek injunctive relief because they had never attempted to return to the offending courthouse, and had not even alleged that they intend to do so in the future. The likelihood of future discrimination therefore remained "conjectural, hypothetical, or contingent" and not "real and immediate." *Shotz v. Cates*, 256 F.3d at 1082 (ADA Title II public entity case); *following Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir.1985).

Standing is a threshold jurisdictional issue which must be addressed prior to and independent of the merits of a party's claims. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir.2005). A court must zealously assure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises. *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir.2001).

## B. BARRIERS TO ENTRY IN PUBLIC ACCOMMODATIONS

Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations. 42 U.S.C. § 12182(a).[2] The general prohibitions are supplemented by various specific requirements. Entities that provide public accommodations 1.) may not impose "eligibility criteria" that tend to screen out disabled individuals, § 12182(b)(2)(A)(i); 2.) must make "reasonable modifications in polices, practices, or procedures, when such modifications are necessary" to provide disabled individuals full and equal enjoyment, § 12182(b)(2)(A)(ii); 3.) must provide auxiliary aids and services to disabled individuals, § 12182(b)(2)(A)(iii); and 4.) must remove architectural and structural barriers, or if barrier removal is not readily achievable, must ensure equal access for the disabled through alternative methods, § 12182(b)(2)(A)(iv)-(v).[3] *See Spector v. Norwegian Cruise Line Ltd.*, —— U.S.

---

**2.** Section 12182(a) provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

**3.** Section 12182(b)(2)(A) (specific prohibitions on discrimination) provides:

For purposes of subsection (a) of this section, discrimination includes—

(i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

(ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to

——, ——, 125 S.Ct. 2169, 2176, 162 L.Ed.2d 97 (2005).

As noted by the Supreme Court in *Spector*, 125 S.Ct at 2176, these specific requirements, in turn, are subject to important exceptions and limitations. Policies, practices, and procedures need not be modified, and auxiliary aids need not be provided, if doing so would "fundamentally alter" the services or accommodations being offered. § 12182(b)(2)(A)(ii)-(iii) The barrier removal and alternative access requirements do not apply when these requirements are not "readily achievable," §§ 12182(b)(2)(A)(iv)-(v). Additionally, structural modifications are not readily achievable within the meaning of § 12181(9) if it would pose a direct threat to the health or safety of others. 125 S.Ct. at 2181. Title III requires a public accommodation to make an individualized inquiry as to whether a specific modification for a particular person's disability would be reasonable and necessary for that person, and yet not work a fundamental alteration.

*PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001).

## C. DECISIONS OF THE UNITED STATES DISTRICT COURTS

The United States District Courts in Florida have recently adjudicated a flood of ADA premises liability cases, many of which have been brought by Charouhis, Rodriguez, Brother, and various associations for the disabled. The following is a chronology of the relevant decisions, divided into cases that preceded this Court's February 26, 2004 decision on attorney's fees (now on remand), and those that followed that decision.

### 1. Decisions Prior to Order Dated February 26, 2004

### a. Judge Spaulding's Unpublished [4] Decision

 Jorge Luis Rodriguez, Daniel Ruiz, and the Association for Disabled Ameri-

---

afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

(iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden;

(iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable; and

(v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

4. Reliance on unpublished opinions is not favored. Although litigants may cite unpublished opinions to the Eleventh Circuit as persuasive authority provided that a copy of the opinion is attached to a brief, they are not considered binding precedent. *See* Eleventh Circuit Rule 36.2, I.O.P. No. 5. Nevertheless, the "unpublished" opinions cited in this memorandum of decision are publicly available on CM/ECF (the Court's automated Case Management / Electronic Case Filing system) through PACER (Public Access to Records), which satisfies the requirement of the E–Government Act of 2002 that all written opinions be publicly accessible and text-searchable.

cans filed an ADA premises liability lawsuit against the owner of a Howard Johnson hotel, and the parties consented to proceed before the Honorable Karla R. Spaulding, United States Magistrate Judge, Orlando Division. *See Association for Disabled Americans v. Orlando Hawaiian Motel Co.,* Case No. 6:98–cv–Orl–KRS. After an evidentiary hearing, Judge Spaulding determined that Charouhis and the plaintiffs had filed a document falsely stating that they had entered into a settlement agreement even though a dispute existed regarding whether a settlement agreement had ever been fully executed. Case No. 6:98–cv–Orl–KRS, Docket No. 105 at 18 (M.D. Fla. June 26, 2002).

Judge Spaulding awarded no fees for plaintiff's expert, Michael Brennan, noting an earlier finding by the Honorable David A. Baker (United States Magistrate Judge, Orlando Division) that Brennan's qualifications were minimal. *Id.* at 26; *citing Association for Disabled Americans, Inc. v. Red Roof Inns, Inc.,* Case No. 6:98–cv–1199–Orl–DAB, Docket No. 82 [available on CM/ECF]. Pursuant to the parties' settlement agreement, Judge Spaulding awarded plaintiffs $24,762.43 in attorney's fees, litigation expenses, and costs—a figure that reflected reduced hourly rates for Charouhis (reduced to $225) and his associates, Christina Galindo ($120) and Lori Barkus ($170), as well as a disallowance of some 60 hours for work that was not awardable, duplicative, unsuccessful, unnecessary, or incurred without first conferring with opposing counsel pursuant to Local Rule 3.01(g). *Id.* at 19—22, 31.

### b. Judge Moody's *Rosenkrantz* Case

In *Rosenkrantz v. Markopoulos,* the Honorable James Moody concluded that a disabled tourist living in Miami lacked standing to sue a hotel located in Clearwater, Florida. The plaintiff lived hundreds of miles away from Clearwater beach; had only been to the location once; traveled only twice a year and the most direct route to and from the plaintiff's destination (North Carolina) came nowhere near the Clearwater area; and plaintiff had available countless other hotels located in the area including several which he had sued. *Rosenkrantz v. Markopoulos,* 254 F.Supp.2d 1250, 1253 (M.D.Fla. March 27, 2003); *followed in Brother v. Tiger Partner,* LLC, 331 F.Supp.2d 1368, 1374 (M.D.Fla.2004).

### c. The "Cottage Industry" Case

Three minutes before Plaintiff Jorge Luis Rodriguez filed the instant lawsuit against Integra and Enclave, Case No. 6:02–cv–917–31JGG, he filed a nearly identical ADA premises liability lawsuit against another hotel.[5] *See Rodriguez v. Investco, L.L.C.,* Case No. 6:02–cv–916–Orl–31KRS (consecutive case numbers). Two days before the undersigned magistrate judge issued the February 26, 2004 order granting in part and denying in part Charouhis' motion for attorney's fees and expenses [Case No. 6:02–cv–917–31JGG, Docket No. 71], the Honorable Gregory A. Presnell issued a widely-circulated decision in *Rodriguez v. Investco,* L.L.C., Case No. 6:02–cv–916–Orl–31KRS. *See Rodriguez v. Investco, L.L.C.,* 305 F.Supp.2d 1278 (M.D.Fla.2004) [the "Cottage Industry"

---

**5.** The complaint in *Rodriguez v. Investco, L.L.C.,* Case No. 6:02–cv–916–Orl–31KRS also includes Daniel Ruiz and the Association for Disabled Americans as original plaintiffs. Following an order to show cause why the Association for Disabled Americans, Inc.'s claims should not be dismissed for lack of standing, Charouhis moved to withdraw from representing Ruiz and the Association on the ground that they had discharged him. As in the case now before the Court, Charouhis filed a retaining lien and fee claim against them. *See* Case No. 6:02–cv–916–Orl–31KRS, Docket Nos. 1, 25—27.

case]. Following a bench trial on January 9, 2004, Judge Presnell found as follows.

Plaintiff, Jorge Luis Rodriguez, suffered a diving accident in 1985, which rendered him a quadriplegic. He was wheelchair-bound and had limited use of his arms and hands. Until recently, he had lived and worked in Miami. *Rodriguez v. Investco, L.L.C.*, 305 F.Supp.2d at 1279. Approximately one year before the trial, Rodriguez moved to Deltona, Florida, and was unemployed at the time of the trial. During the past few years, Rodriguez has filed almost 200 lawsuits against various establishments, alleging violations of the ADA. In most of these cases, Rodriguez has been represented by the same counsel, William Charouhis. 305 F.Supp.2d at 1279.

In the case tried by Judge Presnell, Rodriguez had stayed at the defendant's hotel facility in May 2002 before the defendant owned or operated it. Rodriguez wished to stay two nights but stayed only one, claiming that he was not able to enjoy the facility because of barriers he encountered. Accordingly, he called Charouhis, who inspected the property on August 3, 2002. On August 5, 2002, Charouhis advised Rodriguez that the hotel was not ADA compliant, and thus filed this lawsuit four days later. 305 F.Supp.2d at 1279.

At trial, Rodriguez testified that he wished to return to the hotel for another visit, and had made a reservation for the nights of June 22 and 23, 2004. This reservation was made two days before the trial commenced. Plaintiff could not explain why he would choose to stay at the hotel, when other nearby hotels admittedly met his needs. Judge Presnell found that the real reason for the reservation was obvious: his attempt to comply with the requirement that he prove an intent to return. 305 F.Supp.2d at 1280 and n. 3.

At the bench trial, Rodriguez called an expert witness, Thomas Ricci, who introduced a report listing the deficiencies inherent at the time of the defendant's acquisition of the hotel. Judge Presnell found that Ricci's report was "exaggerated and misleading." For example, Ricci criticized access to a non-existent tennis court, and criticized the size, shape, and slope of non-existent handrails and grab bars. Moreover, Judge Presnell found that the photos attached to Ricci's report could not be matched to the violation being alleged, and found no basis in the evidence for other expert opinions expressed by Ricci. 305 F.Supp.2d at 1280 and n. 6—8.

Judge Presnell noted that, although the ADA's private remedies are limited to injunctive relief, 42 U.S.C. § 12188(a), the ADA nevertheless contains an incentive to private litigation—the attorney's fee provision (42 U.S.C. § 12205).[6] 305 F.Supp.2d at 1281 and n. 9. According to Judge Presnell, the ADA's statutory scheme has resulted in an explosion of private ADA-related litigation. 305 F.Supp.2d at 1281. In the Middle District of Florida alone, there have been hundreds of Title III cases filed in the past three years. These cases have been filed by a relatively small number of plaintiffs (and their counsel) who have assumed the role of private attorneys general. Five hundred and seventy nine cases have been filed by only five organizations (and a few of their associated members): Access 4 All, Inc.; Access Now, Inc.; Association for Disabled Americans, Inc.; Access for America, Inc.; and Access for Disabled, Inc. 305 F.Supp.2d at 1281. During this period, Plaintiff, Jorge Rodriguez, represented by Charouhis, also filed 11 individual cases in the Middle District of Florida. Charouhis has been coun-

---

**6.** 42 U.S.C. § 12205 provides "In any action ... commenced pursuant to this chapter, the court ..., in its discretion, may allow the prevailing party ... a reasonable attorney's fee, including litigation expenses, and costs ..."

sel in 75 cases in this district during the past three years. In 27 of these cases, the Court has had occasion to issue 33 show cause orders for his failure to abide by the Court's orders. 305 F.Supp.2d at 1281.

Judge Presnell found that the case that he had just tried was a "case in point." Rodriguez had filed the suit less than a week after Charouhis had verified the ADA deficiencies. Charouhis made no effort to communicate with the property owner to encourage voluntary compliance. Had Charouhis contacted the first named defendant, he would have learned that the entity he was about to sue was in bankruptcy. Charouhis gave no warning and no offer to forbear during a reasonable period of time while remedial measures are taken. 305 F.Supp.2d at 1281.

Judge Presnell then posed and answered two central questions. First, he asked:

Why would an individual like Plaintiff be in such a rush to file suit when only injunctive relief is available? Wouldn't conciliation and voluntary compliance be a more rational solution? Of course it would, but pre-suit settlements do not vest plaintiffs' counsel with an entitlement to attorney's fees. *Buckhannon Bd. and Care Home, Inc., v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Moreover, if a plaintiff forebears and attempts pre-litigation resolution, someone else may come along and sue first. The current ADA lawsuit binge is, therefore, essentially driven by economics—that is, the economics of attorney's fees.

305 F.Supp.2d at 1281—82 (footnotes omitted from quotation). Indeed, the Middle District of Florida is already experiencing competing claims by different plaintiffs over that same facility. *Cf. Disability Advocates v. Cocoa Beach Hotel,* Case No. 6:03–cv–1770–Orl–22KRS and *Access 4 All, Inc. v. Cocoa Beach Hotel,* Case No. 6:03–

cv–1564–Orl–22KRS. 305 F.Supp.2d at 1281, n. 13. Second, Judge Presnell asked:

One might reasonably ask whether attorney's fees should be awarded where no effort is made pre-suit to obtain voluntary compliance. After all, if the litigation achieves no result other than that which could be accomplished by agreement, what social or economic value has been added by the lawyer's decision to file a suit without warning? Indeed, under this scenario, it would seem that litigation carries only negative economic value—it has accomplished nothing but expense and waste of precious judicial resources.

305 F.Supp.2d at 1282, n. 14.

At trial, Judge Presnell found Rodriguez to be "evasive and willfully ignorant, and totally lacking credibility." 305 F.Supp.2d at 1285. Rodriguez's explanation for his initial visit to the facility was disingenuous, and he did not convey any honest desire to return there. Rodriguez's testimony left Judge Presnell with the distinct impression that Rodriguez was "merely a professional pawn in an ongoing scheme to bilk attorney's fees from the Defendant." 305 F.Supp.2d at 1285. Rodriguez had relied on an inapplicable legal theory to argue that the defendant was engaging in unlawful discrimination, and also failed to establish at trial that the defendant had subjected him to any discrimination in regard to the facility. The Court therefore entered judgment for the defendant, and assessed costs against Rodriguez. 305 F.Supp.2d at 1285.

### 2. Decisions After Order Dated February 26, 2004

#### a. Judge Martinez's Case

Following a bench trial in the Southern District of Florida, the Honorable Jose E. Martinez found that Steven Brother lacked standing to complain about purely specula-

tive injuries arising from alleged barriers in a hotel at which he had never stayed, and entered judgment for the hotel. *Brother v. CPL Investments, Inc.*, 317 F.Supp.2d 1358 (S.D.Fla. March 22, 2004). In light of Brother's extensive litigation (more than 50 ADA suits in Florida in the last year), the fact that he had never stayed at the hotel (but had visually inspected it), and his hollow testimony about why he did not keep a subsequent reservation, Judge Martinez refused to credit Brother's allegation that he intended to patronize the hotel again. 317 F.Supp.2d 1358 at 1360—61, 1369 (also citing Judge Presnell's month-old "Cottage Industry" decision).

Furthermore, the allegedly wrongful behavior could not reasonably be expected to recur because—to the extent the alleged barriers ever existed—the hotel remedied them after notification of Brother's complaints in the form of the lawsuit. 317 F.Supp.2d 1358 at 1372—73. According to Judge Martinez, Ricci's expert report was "based on misinformation and lack of information"; "confusing and difficult to follow"; "based on assumptions and omissions of relevant information"; and such an unreliable assessment of the facility that it did little to assist the plaintiffs in establishing their prima facie case. 317 F.Supp.2d 1358 at 1372—73.

#### b. Judge Conway Calls for a Legislative Solution

The Honorable Anne C. Conway also had occasion to find that, despite Brother's affidavit asserting his specific intent to return to defendant's hotel, Brother had demonstrated no credible threat of future injury, and therefore lacked standing to sue. *Brother v. Tiger Partner, LLC*, 331 F.Supp.2d 1368, 1374 (M.D.Fla. July 6, 2004). Judge Conway reasoned that:

> First, Mr. Brother lives more than two hundred and eighty miles (280) away from the subject property, and admits

that he travels to the greater Orlando area (Disney World in particular) only about twice a year. Second, Mr. Brother's testimony indicates he lacks "a continuing connection" to the subject property. Mr. Brother, after all, found the Best Western Deltona Inn "by chance." He had never attempted to stay at that location prior to the Fall or Winter of 2002. Moreover, he has not attempted to return to the Best Western Deltona Inn since that time. Also, it is undisputed that Mr. Brother never stayed at the Best Western Deltona Inn on the night in question. This Court additionally notes that there are countless other hotels located closer to Disney World than the Best Western Deltona Inn (which is located approximately fifty miles from that tourist attraction) including hotels that Mr. Brother is suing.

331 F.Supp.2d at 1373 (citations omitted). In view of his extensive litigation history, Judge Conway found Brother's professed intent to return to the property insufficient to satisfy Article III's standing requirement—noting that Brother's family lives on social security checks and food stamps totaling $1,600 per month, yet has professed an intent to return to all fifty-four of the properties he has sued. 331 F.Supp.2d at 1369, 1375—76.

Expressing concern that Charouhis and his clients will simply find some device to satisfy Article III's standing requirements, Judge Conway called for a legislative solution:

> This being said, it should be emphasized that the system for adjudicating disputes under the ADA cries out for a legislative solution. Only Congress can respond to vexatious litigation tactics that otherwise comply with its statutory frameworks. Instead of promoting "conciliation and voluntary compliance[,]" the existing law encourages

massive litigation. "[P]re-suit settlements[,]" after all, "do not vest plaintiffs' counsel with an entitlement to attorney's fees" under the ADA. Moreover, the means for enforcing the ADA (attorney's fees) have become more important and desirable than the end (accessibility for disabled individuals). This is particularly the case in the Middle District of Florida where the same plaintiffs file hundreds of lawsuits against establishments they purportedly visit regularly. This type of shotgun litigation undermines both the spirit and purpose of the ADA.

331 F.Supp.2d at 1375 (citations omitted).[7]

#### c. Judge Klein's Case

In *Brother v. Miami Hotel Investments, Ltd.*, 341 F.Supp.2d 1230 (S.D.Fla. August 9, 2004), The Honorable Theodore Klein, United States Magistrate Judge addressed attorney's fee issues after entry of a consent decree in an ADA Title III case involving Charouhis. Referring to Charouhis, Judge Klein echoed the alarm sounded by Judge Presnell in the "Cottage Industry" opinion:

> The key word here is reasonable. The Act was never intended to turn a lofty and salutary mission into a fee-generating mill for some lawyers to exploit the statutory scheme to see how many billable hours they could cram into a case before it is either tried or settled. They do a disservice to the disabled, and to the vast majority of lawyers who carry out their duties under the ADA with skill, dedication, and professionalism.
>
> This was a case of ordinary proportions and dimensions. It had no unusual features or unique characteristics. After determining that Defendant was not in compliance with the ADA, Mr. Charouhis immediately filed suit which resulted in the attorney's fee clock to begin ticking. No effort was made to communicate with Defendant and seek compliance before suit, despite the fact that the only remedy in the Act is injunctive relief. That is, aside from attorney's fees, which thus provides an

7. Small business owners often ask this Court to stop the extortion. Typical is the off-the-cuff plea by defense counsel in another ADA Title III case (not involving Charouhis) before Judge Conway:

> There is going on about our state and probably others ... a plaintiff who ... goes to a lot of restaurants ... or other small businesses, and with an expert ... they, [go] not ... to get gas or to eat, but to discover ADA violations. And what happens ... is that they find an attorney that will file these cases.... [Counsel] here has filed 40 cases as a sole practitioner ... And they don't, before they file these cases, go to the defendant ... and say, 'hey, will you fix this.' They file the case first ... [a]nd then ... an opportunity to settle arises ... and the attorney, of course, gets his fee. And if you take attorneys that have 40, 50, and more cases each, flooding the courts with these things, not for the purpose of obtaining relief for their clients, but for the purpose of entering into settlements because the busi-

nesses they pick can't afford to defend the case, and then the attorney and the experts splitting the settlement fee. And God knows what these plaintiffs get.... I have seen enough of this to know that there's a need ... for the courts not to just allow the system to be abused in this manner ... of using the courts for extortionative [sic] purposes .... [P]eople who just go to restaurants for the purpose of putting together a claim with never having any intention really of going back ... don't have standing.... So ... these cases, which really don't have ... any merit ... are filed time and time again ... people are paying money to settle them rather, because the cost of litigating them will be much more.... It burdens the courts unnecessarily and puts small businesses ... into a very impossible position.

*Footman v. Cheung*, 341 F.Supp.2d 1218, 1229—30 (M.D.Fla.), *affirmed in part and dismissed as moot in part*, 2005 WL 1253884 (11th Cir. May 27, 2005).

incentive for protracted litigation as opposed to pre-suit or post-suit early settlement. 341 F.Supp.2d at 1233.

According to Judge Klein, the facts contradicted Charouhis's assertion that his firm is one of the most "well respected ADA plaintiff's firm in this jurisdiction." Judge Klein noted Judge Moreno's reduction of Charouhis's fees due to unreasonable conduct, and Judge Klein's own findings of unjustified failures to appear, equivocation, and an explanation that was "disingenuous, contrived, and in bad faith." 341 F.Supp.2d at 1234. The Court found that much of the delay in the case was attributable to Charouhis, that many of the hours expended by Chaouhis and Barkus were "unnecessary, redundant, and duplicative," that the time records were "replete with unnecessary work and duplication" too numerous to detail, and that the hours claimed for the fee application were "totally disproportionate and grossly inflated." 341 F.Supp.2d at 1236 (e.g., 50 hours for the case, and 20—25 hours to show why the 50 hours were reasonable). Judge Klien refused to allow Charouhis fees for "failing to abide by his stipulation, and then engaging in duplicitous conduct in court resulting in a sanctions order." *Id.*

Judge Klein found that Charouhis could have achieved the same result much more efficiently and far less expensively:

> Furthermore, Plaintiff could have achieved the same result by engaging in early settlement with Defendant, whose counsel claims he was willing to do so and made early offers to resolve the matter amicably. Even if Mr. Charouhis is correct that he sought to advance the settlement process, it appears that the protracted litigation engaged in by Plaintiff's counsel had little or no benefit to the client; it only benefitted counsel. Fees may be adjusted downward based on the fact that much of the time expended was of minimal value to the ultimate result since the same or a substantially similar result could have been achieved without the expenditure of much of that time. The Court is permitted to reduce fees if the litigation did not achieve the anticipated results. In this instance, it was not the protracted litigation that achieved the results. The results could have been achieved much more efficiently and far less expensively.

341 F.Supp.2d at 1239—40.

### d. Judge Bucklew's Unpublished Decision

In *Brother v. Rossmore Tampa Ltd. Partnership*, the Honorable Susan C. Bucklew concluded that Brother lacked standing to assert an ADA claim against a hotel in Tampa. Judge Bucklew reasoned that: 1.) Brother had never spent the night at the hotel; 2.) Brother visited the hotel only once before bringing suit and one time after suit was filed; and 3.) Brother's affidavit stating his intent to return to the Tampa hotel while attending a walk-a-thon in Bradenton "lacked credibility" and was "merely a convenient statement in an attempt to satisfy the standing requirement." Case No. 8:03–cv–1253–T–24MAP, Docket No. 127 (M.D.Fla. August 19, 2004)(also finding in n. 7 that Brother had been "less than candid with the Court")[available on CM/ECF]. Judge Bucklew therefore dismissed the case pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, and Brother did not appeal.

### e. Judge Moody's Unpublished Order Denying Fees

In *Colleen Macort and Access Now, Inc. v. Checker Drive–In Restaurants, Inc.*, 8:03–cv–1328–T–30EAJ [available on CM/ECF], a plaintiff who had brought 53 ADA lawsuits in the Middle District of Florida

had sued the owner of a restaurant demanding injunctive relief compelling the remediation of barriers to entry. In order to "prevent this case from simply becoming an income generating device for the Plaintiffs' attorneys" (not Charouhis), the restaurant asked the Honorable James Moody to stay the proceedings pending remediation, which he did. *See* Case No. 8:03–cv–1328–T–30EAJ, Docket Nos. 11, 13.

When the plaintiffs later moved for attorneys fees and costs, Judge Moody summarily denied the motion in a two-page order. Case No. 8:03–cv–1328–T–30EAJ, Docket No. 31 (January 28, 2005). Citing judge Conway's *Tiger Partner* case and Judge Presnell's "Cottage Industry" decision, Judge Moody observed that the purpose of the ADA is to ensure accessibility to public accommodations, not to enrich attorneys. Judge Moody exercised his discretion under 42 U.S.C. § 12205 not to award attorney's fees "for prosecuting a lawsuit when a pre-suit letter to the defendant would have achieved the same result." Case No. 8:03–cv–1328–T–30EAJ, Docket No. 31 at 1—2 (January 28, 2005).

### f. Judge Jones's Case

In *Access 4 All v. Oak Spring, Inc.*, 2005 WL 1212663, Case No. 5:04–cv–75–O–GRJ (M.D.Fla. May 20, 2005), the Honorable Gary R. Jones granted summary judgment in favor of the owner of a Howard Johnson hotel in Ocala. The individual plaintiff (Felix Esposito), a "self-described spy for all disabled people," sought out violations of the ADA, and then filed federal lawsuits against the hotels as a kind of private attorney general. 2005 WL 1212663 at *2. Following *Tiger Partner* and *Rosenkrantz*, Judge Jones held that the plaintiffs had failed to show that they had standing to seek the requested injunctive relief. Other than Esposito's bald assertion that he plans to return to the Howard Johnson, Esposito and Access 4 All had not alleged a real and immediate threat of future injury which would be addressed through an injunction.

Judge Jones reasoned that Esposito lives in Broward County, Florida, a five hour drive from Ocala, and that he had no continuing connection to the greater Ocala area. 2005 WL 1212663 at *5. Espositio's general statement that he enjoys traveling represented no more than speculative future injury, particularly in light of his statement of intent to return to all of the approximately one hundred hotels that he has sued. 2005 WL 1212663 at *5. Additionally, Judge Jones granted summary judgment because Esposito brought his claim to benefit others, for his own personal benefit—indeed many of Esposito's claims involved barriers that concerned people with other disabilities. 2005 WL 1212663 at *6.

## D. THE LAW ON CALCULATION OF ATTORNEY'S FEES

Laudable purposes underlie the ADA.[8] Lawyers must be available and willing to take on ADA cases. Congress therefore

---

8. The purposes for the ADA set forth in 42 U.S.C. § 12101(b) are:

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

granted discretion to the district courts to award or deny to a prevailing party a reasonable attorney's fee, litigation expenses, and costs.[9] 42 U.S.C. § 12205. The United States Supreme Court, however, expects that a request for attorney's fees will not result in a second major litigation, and that ideally the litigants will settle the amount of the fee. *Hensley v. Eckerhart*, 461 U.S. 434, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Justices Brennan, Marshall, Blackmun, and Stevens characterized post-judgment litigation over attorneys fees and related appeals as "one of the least socially productive types of litigation imaginable." *Id.* at 442, 103 S.Ct. 1933 (concurring in part and dissenting in part).

Historically, attorney's fees awards have been analyzed according to *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974).[10] *Johnson* set forth twelve factors to be considered in calculation of a fee award.[11] The Eleventh Circuit has consistently refined calculation of awards of attorney's fees to comport with decisions of the Supreme Court, *Norman v. Housing Auth.*, 836 F.2d 1292, 1299 (11th Cir.1988). *Norman* adopted the lodestar approach for calculation of attorney's fees which presumptively includes the twelve factors adopted in *Johnson*, 488 F.2d 714. *Norman*, 836 F.2d at 1298—9.

■ Therefore, the Eleventh Circuit applies the lodestar as developed by *Norman* and its progeny in establishing a reasonable attorney's fee. *Camden I Condominium Assoc., Inc. v. Dunkle*, 946 F.2d 768, 772 (11th Cir.1991); *see also Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Simply stated, the lodestar is the product of the number of reasonable hours expended and the reasonable hourly rate. *Burlington v. Dague*, 505 U.S. 557, 559—560, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)(*citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)).

## 1. Reasonable Hourly Rate

■ The Court must first determine the reasonable hourly rate. *Duckworth v. Whisenant*, 97 F.3d 1393 (11th Cir.1996); *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir.1994); *Norman v. Housing Auth.*, 836 F.2d 1292, 1299 (11th Cir.1988). The reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services provided by lawyers of reasonably comparable skills, experience, and reputation. *Norman*, 836 F.2d at 1299. The party seeking attorney's fees bears the burden of producing "satisfactory evidence that the requested rate is in line with prevailing market

---

9. 42 U.S.C. § 12205 provides: "In any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs, and the United States shall be liable for the foregoing the same as a private individual."

10. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit prior to the close of business day on September 30, 1981.

11. Those twelve factors are: (1)the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717—9.

rates," which requires "more than the affidavit of the attorney performing the work." *Loranger*, 10 F.3d at 781 (*citing Norman*, 836 F.2d at 1299). Evidenced may be established through either direct evidence of rates for similar services or by opinion evidence. *Norman*, 836 F.2d at 1299.

■ The Eleventh Circuit looks to skill as the ultimate determinate of compensation level because experience and reputation are a mirror image of skill. *Norman*, 836 F.2d at 1300. Skill is evidenced by an attorney's initial case assessment, continuing negotiation and settlement attempts, persuasiveness, and other fundamental aspects of organization and efficiency. *Norman*, 836 F.2d at 1300—1301. Organization means that "discovery devices and motions are thought out and not utilized in a random and erratic way or for the mere purpose of going through established routines. Efficiency means doing well just what out to be done and doing it in a minimum time." *Norman*, 836 F.2d at 1301. Legal skill, therefore, correlates to a knowledge of both trial practice and substantive law. *Norman*, 836 F.2d at 1301.

Although an attorney who must familiarize herself with either or both aspects of practice may prove exemplary as an advocate, he does not have a right to claim comparable skill to attorneys whose first actions are directed at the finer points of the case. *Norman*, 836 F.2d at 1301. No two attorneys possess the same skill, therefore the Court must look to the range provided by the evidence and interpolate a reasonable market rate. *Norman*, 836 F.2d at 1300. In summary, the Eleventh Circuit mandates that a reasonable rate is determined by a range of fees established by the marketplace and modified by reference to an individual attorney's skill. *Norman*, 836 F.2d at 1301; *e.g., Duckworth*, 97 F.3d 1393 (11th Cir.1996).

## 2. Reasonable Hours Expended

■ The second step of determining the lodestar requires the Court to determine the reasonable number of hours expended in the litigation. *Norman*, 836 F.2d at 1302. Inquiry into the reasonable number of hours focuses on the exercise of "billing judgment"—exclusion of those hours not reasonably billable to a client irrespective of counsel's skill, therefore the Court must deduct for redundant hours. *Norman*, 836 F.2d at 1301—2 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). A court must not consider an attorney's skill at this stage as this would constitute a double penalty— the rate would first be decreased and the hours would then be lowered. *Norman*, 836 F.2d at 1301.

■ The fee applicant bears the burden of documenting the appropriate number of hours. *Norman*, 836 F.2d at 1303 (citing *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933); *United States v. Blue Cross and Blue Shield of Florida, Inc.*, 882 F.Supp. 166, 170 (M.D.Fla.1995). Generalized statements concerning reasonableness are of little or no assistance to the Court, instead proof of the hours dedicated to litigation and any corresponding objections must be made with sufficient specificity. *Duckworth*, 97 F.3d at 1396; *Norman*, 836 F.2d at 1301. The fee applicant does not receive compensation for unsuccessful claims, therefore the Court deducts time devoted to discrete and unsuccessful claims. *Norman*, 836 F.2d at 1302. Throughout the calculation of the lodestar, the Court remains cognizant that it is itself an expert on the question, and may consider the request in light of its own knowledge and experience with or without the aid of witnesses as to value or hours dedicated to litigation. *Loranger*, 10 F.3d at 781; *Norman*, 836 F.2d at 1303.

### 3. Adjustment of the Lodestar

■ At its discretion, the Court may adjust the lodestar in light of the results obtained. *Duckworth,* 97 F.3d at 1399; *Norman,* 836 F.2d at 1302. Adjustments may be based upon partial or limited success or exceptional results. *Hensley,* 461 U.S. at 436—37, 103 S.Ct. 1933. Yet, even if the results were exceptional, no enhancement is permissible unless there is specific evidence establishing that the quality of representation was superior to that which could be reasonably expected in light of the rates claimed because the rate claimed should reflect the attorney's skill. *Norman,* 836 F.2d at 1302.

### E. THE LAW ON CALCULATION OF COSTS

■ A prevailing party may recover costs *as a matter of course* unless otherwise directed by the Court or applicable statute. *See* Fed.R.Civ.P. 54(d)(1).[12] Congress has delineated which costs are recoverable under Rule 54(d), Fed.R.Civ.P. *See* 28 U.S.C. § 1920;[13] *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 441—42, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). When challenging whether costs are properly taxable, the burden lies with the losing party, unless the knowledge regarding the proposed cost is a matter within the exclusive knowledge of the prevailing party. *See Desisto College, Inc. v. Howey–in–the–Hills,* 718 F.Supp. 906, 910 n. 1 (M.D.Fla.1989), *declined to follow on other grounds by EEOC v. W & O, Inc.,* 213 F.3d 600 (11th Cir.2000). The Court has the discretion to award those costs specifically enumerated in 28 U.S.C. § 1920. *See Crawford,* 482 U.S. at 440–44, 107 S.Ct. 2494. The Court may not tax as costs any items not included in 28 U.S.C. § 1920. 482 U.S. at 440–44, 107 S.Ct. 2494; *see also Morrison v. Reichhold Chemicals, Inc.,* 97 F.3d 460 (11th Cir. 1996); *Desisto,* 718 F.Supp. at 911.

■ Congress has also established the fees payable to a witness, and the extent to which those fees are included in awardable costs. 28 U.S.C. § 1821; *see Crawford,* 482 U.S. at 437, 107 S.Ct. 2494. When a prevailing party seeks reimbursement for fees paid to its own expert witnesses—as opposed to those appointed by the court— "a federal court is bound by the limit of 28 U.S.C. § 1821(b), absent contract or *explicit* statutory authority to the contrary." *Crawford,* 482 U.S. at 442, 107 S.Ct. 2494 (emphasis added); *see Morrison v. Reichhold Chemicals, Inc.,* 97 F.3d 460, 463 (11th Cir.1996). Section 1920(3)'s provision for the costs of witness fees is specifically limited by § 1821. *See Crawford,* 482

---

12. Fed.R.Civ.P. 54(d)(1) provides:

Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. Such costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

13. Title 28 U.S.C. § 1920 provides:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;
(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

U.S. at 441—42, 107 S.Ct. 2494; *see also Kivi v. Nationwide Mutual Insurance Company*, 695 F.2d 1285, 1289 (11th Cir. 1983); *Loughan v. Firestone Tire & Rubber Company*, 749 F.2d 1519, 1526 (11th Cir.1985) (upholding a denial of expert witness fees in excess of those awardable under § 1821 in a products liability diversity case).

■■■ Section 1920(2) authorizes the taxation of costs for the "[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." 28 U.S.C. § 1920(2); *EEOC*, 213 F.3d at 620; *see Maris Distributing Co. v. Anheuser–Busch, Inc.*, 302 F.3d 1207, 1225 (11th Cir.2002). Even though § 1920(2) does not specifically use the word "deposition," deposition transcript costs (like costs for other transcripts) are taxable only if the deposition was "necessarily obtained" for use in the case. *EEOC*, 213 F.3d at 621. District courts have great latitude in determining whether a deposition was "necessarily obtained" for use in the case. *Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330, 337 (5th Cir. Unit B June 1981).

■■■ Deposition costs of witnesses on a losing party's witness list are generally considered taxable. *Maris Distributing Co. v. Anheuser–Busch, Inc.*, 302 F.3d at 1225. In addition, deposition costs are taxable even if a prevailing party's use of a deposition is minimal or not critical to that party's ultimate success, unless the losing party demonstrates that the deposition was not related to an issue present in the case at the time of the deposition. *EEOC*, 213 F.3d at 621.

■■■ In addition to the costs allowable under § 1920, Congress has provided that, in an ADA Title III case, a district court "in its discretion, may allow the prevailing party ... a reasonable attorney's fee, including litigation expenses, and costs." 42 U.S.C. § 12205. Accordingly, this Court has discretion in this Title III case to award reasonable litigation expenses and costs that fall outside of § 1920.

## III. *PROCEDURAL HISTORY*

Plaintiffs are professional litigants. Over the last six years, Jorge Louis Rodriguez—often in conjunction with the Association for Disabled Americans, Inc.—has filed 69 lawsuits in the Middle District of Florida demanding relief from restaurants, hotels, and similar businesses.[14] Rodriguez has filed another 116 such lawsuits in the Southern District of Florida.[15] Steven Brother has filed 50 lawsuits in Florida in just one year. *See* 317 F.Supp.2d 1358. William Nicholas Charouhis of Miami, Florida, has been attorney of record in 127 disability lawsuits against restaurants, hotels, and similar businesses in the Middle District of Florida. Charouhis has brought some 976 disability and other lawsuits in the Southern District of Florida. Charouhis states that he has litigated more than 230 ADA cases over eight years. Docket No. 61 at 13—14.

### A. Three Plaintiffs Claim Discrimination

On August 9, 2002, Charouhis commenced this action by filing a complaint on behalf of three plaintiffs—Association for Disabled Americans, Inc., Daniel Ruiz, and Jorge Luis Rodriguez. Docket No. 1.[16] In

14. This Court's dockets and opinions are publicly available on this Court's Case Management and Electronic Case Filing ["CM/ECF"] system.

15. At present, data from the Southern District of Florida is available only through the Clerk's automated access to court records.

16. The citation "Docket No. ___" refers to a docket entry in the lowest-numbered case, Case No. 6:02–cv–917–Orl–31JGG. Citations to docket entries in the two higher-numbered consolidated cases will specify the case number, e.g., "Case No. 6:03–cv–264, Docket No. ___."

the complaint, Plaintiffs allege that two defendants, Integra Resort Management, Inc. ["Integra"] and Enclave Resort Hotel, LLC d/b/a The Enclave ["Enclave"], owned and operated a hotel containing numerous guest rooms and facilities that were inaccessible to individuals with disabilities, and that Defendants had discriminated against disabled persons by denying them benefits equal to those provided to able-bodied individuals. Docket No. 1 at 5. The complaint accused Defendants of some fifty or more specific violations of the ADA, pertaining, for example, to ramps with appropriate slopes; hearing-impaired properly-positioned telephones; widened doorways; insulated restroom pipes; visual and audible alarms; accessible shuttles; paths of access to the pool area without steps; lowered coat hooks; mirrors in public restrooms; and Braille signs in all spaces. Docket No. 1 at 6—9.

In the complaint, the Association for Disabled Americans, Inc. asserts that it is a "non-profit" corporation, whose purpose is to assure the accessibility of public accommodations for its members, and to provide speakers, seminars, counseling, information, aid, and donations for disability issues. The complaint alleges that defendants Integra and Enclave discriminated against the Association for Disabled Americans, Inc. because of its association with its disabled members and their disability claims. Docket No. 1 at 2. The Association for Disabled Americans, Inc. claims that discrimination by Integra and Enclave has caused an "impairment" of the Association's time and money. Docket No. 1 at 2.

The complaint also alleges that Plaintiffs Daniel Ruiz and Jorge Luis Rodriguez are individuals with disabilities who are members of the Association. Docket No. 1 at 3. According to the complaint, Ruiz and Rodriguez both attempted to access and use the premises of the Enclave Resort Hotel, but were "excluded from proper unob-structed access and use" by "barriers to access" resulting from ADA violations. Docket No. 1 at 3. The complaint further claims that both Ruiz and Rodriguez intend to return to the hotel in the future:

The Association's members, and the individual Plaintiffs, intend to gain access into and use the premises and the facilities thereof in the future, as members of the able-bodied community are presently able to do, but they will be denied such access and use as a result of Defendants'. failure to remove barriers to access and comply with the ADA as set forth therein and are at serious risk of suffering further and irreparable injury without the relief requested herein.

Docket No. 1 at 3. Plaintiffs demand that the Court issue a permanent injunction against continuing the discriminatory practices; order the defendants to modify the premises; order the hotel closed until the requisite modifications have been completed; and award attorneys fees, costs, and litigation expenses pursuant to 42 U.S.C. § 12205. Docket No. 1 at 11.

On September 11, 2002, Integra and Enclave filed an answer denying discrimination, and denying that Plaintiffs intend to return. As an affirmative defense, defendants assert that they have complied with the ADA, and that all "readily achievable" architectural barriers have been removed. Docket No. 8. Defendants also asserted as an affirmative defense that Plaintiffs brought the action in bad faith, without adequate factual basis or investigation, without a prior request or demand of any sort, and for the improper purpose of harassment and recovery of needless attorneys fees. Docket No. 8 at 3.

Charouhis notified the Court that this case is not related to any pending or closed case filed in any court. Docket No. 11. In the Case Management Report, the parties advised the Court that settlement

was likely. Docket No. 12 at 7. On October 31, 2002, the Court entered a Case Management and Scheduling Order setting various dates, including a bench trial set for the trial term beginning November 3, 2003. Docket No. 13.

### B. Two of the Three Plaintiffs Discharge Charouhis

On March 4, 2003, Charouhis filed a motion seeking permission to withdraw as counsel for both the Association for Disabled Americans, Inc. and Daniel Ruiz, the Association's president. Docket No. 15. The motion states that Ruiz and the Association discharged Charouhis, and directed him to "cease and desist from taking any further actions" on their behalf. *Id.*

Charouhis also filed a Notice of Lien and Fee Claim Against Plaintiffs and Defendants [Docket No. 16] and a Notice of Retaining Lien [Docket No. 17] asserting that withdrawing plaintiffs were responsible for his attorneys fees. This Court struck the lien notices on the ground that they "are not recognized documents for filing in a federal action, and Charouhis has no individual standing as a party or intervenor to seek relief in this case." Docket No. 18.

Charouhis's motion to withdraw asked the Court to allow the Association and Ruiz an appropriate period of time to obtain alternate counsel. Docket No. 15 at 2. On March 7, 2003, the undersigned issued an Order and Notice of Hearing on the Motion to Withdraw ordering that substitute counsel for Ruiz and the Association file a Notice of Appearance, and that the plaintiffs appear at a hearing in person along with their substitute counsel. Docket No. 18. The order warned the plaintiffs that "failure to comply may result in the imposition of sanctions, and the dismissal of all claims brought by Daniel Ruiz and the Association for Disabled Americans, Inc." *Id.* No substitute counsel filed a No-

tice of Appearance or appeared at the March 26, 2003 hearing. Plaintiffs did not appear at the hearing. However, Charouhis informed the Court that he had never notified plaintiffs of the hearing, and that plaintiffs may not have been aware that their case was subject to dismissal for failure to appear. Docket No. 19.

On March 27, 2003, the Court issued an Amended Order and Notice of Hearing. Docket No. 20. The order rescheduled the hearing on Charouhis's Motion to Withdraw, ordered the plaintiffs and their substitute counsel to appear in person, and warned the plaintiffs that "failure to comply may result in the imposition of sanctions, and the dismissal of all claims brought by Daniel Ruiz and the Association for Disabled Americans, Inc." *Id.* The order further directed Charouhis to serve on Daniel Ruiz and the Association a copy of the Motion to Withdraw (Docket 15), the original Order and Notice of Hearing (Docket No. 18), and the Amended Order and Notice of Hearing (Docket No. 20). Charouhis filed a Notice of Service stating that he had served, by certified mail, the documents to Daniel Ruiz and the Association at their last known address. Docket No. 22.

### C. The Second Lawsuit

On March 5, 2003, the day after Charouhis moved to withdraw from representing the Association and Ruiz in Case No. 6:02–cv–917–Orl–31JGG, James V. Johnstone, Esq. filed a separate lawsuit against the condominium association. *See Access for America, Inc. and Doug Wilder v. The Enclave at Orlando Condominium Association, Inc.*, Case No. 6:03–cv–264–Orl–28KRS. In the complaint [Case No. 6:03–cv–264, Docket No. 1], two new plaintiffs allege that one new defendant, The Enclave at Orlando Condominium Association, Inc. [hereinafter "the condominium

association"], "is the owner, lessee, lessor and/or operator of the real property and improvements which are the subject of this action, commonly referred to as The Enclave Suites, located at or about 6165 Carrier Drive, Orlando, Florida 32819 (hereinafter, the 'Facility')." The complaint accuses the condominium association of numerous violations of the ADA. Case No. 6:03–cv–264, Docket No. 1 at 2—10.

In the complaint, Plaintiff Access for America, Inc. asserts that it is a "nonprofit" corporation, whose purpose is to represent its disabled members' interests by assuring the accessibility of public accommodations. The complaint alleges that the condominium association discriminated against Access for America, Inc. because of its association with its disabled members and their disability claims. Case No. 6:03–cv–264, Docket No. 1 at 3. Access for America, Inc. claims that discrimination by the condominium association has caused it unspecified damages. Case No. 6:03–cv–264, Docket No. 1 at 3.

The complaint also alleges that Plaintiff Doug Wilder is a disabled individual who is a member of Access for America, Inc. Docket No. 1 at 3. According to the complaint, both plaintiffs [Wilder and Access for America, Inc.] attempted to access and use the facility, but could not do so because of "physical barriers to access" resulting from ADA violations. Case No. 6:03–cv–264, Docket No. 1 at 5, 10. The complaint further claims that "Plaintiff" [not specifying Wilder or Access for America, Inc.] intends to visit the facility again in the near future in order to utilize all of the facilities offered. Case No. 6:03–cv–264, Docket No. 1 at 5. Plaintiffs claim that

they will suffer irreparable harm unless the Court issues a permanent injunction against continuing the discriminatory practices; order the defendants to modify the premises; order the hotel closed until the requisite modifications have been completed; and award attorneys fees, costs, and litigation expenses pursuant to 42 U.S.C. § 12205. Case No. 6:03–cv–264, Docket No. 1 at 10—11. Johnstone inaccurately certified to this Court that Case No. 6:03–cv–264 is not related to any pending civil case filed with this Court. Case No. 6:03–cv–264, Docket No. 5.

### D. The First Consolidation

The condominium association then moved either to dismiss the complaint, to substitute defendants, or to consolidate the case with Case No. 6:02–cv–917. Case No. 6:03–cv–264, Docket No. 7. Following reassignment of the case from the Honorable John Antoon II, the Honorable Gregory Presnell granted defendant's motion to consolidate on April 11, 2003, and otherwise denied without prejudice defendant's motion to dismiss or substitute defendants. Case No. 6:03–cv–264, Docket No. 12. All pleadings and papers in the consolidated cases were thereafter to be filed in the lower-numbered case, Case No. 6:02–cv–917.[17]

### E. Rodriguez Proceeds Alone Against Integra and Enclave

On April 24, 2003, the Court held a second hearing on Charouhis's Motion to Withdraw. Neither Ruiz nor a representative of the Association nor substitute counsel appeared at the hearing. Accord-

---

17. In the main action, Case No. 6:02–cv–917, defendant Integra Resort Management also moved on April 2, 2003 to consolidate the two cases. Docket No. 21. Integra asserted that the two cases involve the same facility, the same defendants, and substantially the same claims of alleged architectural barriers and acts of discrimination, and that defending two lawsuits would waste judicial time and increase defendants' costs. Docket No. 21 at 2. Judge Presnell consolidated the two cases by order entered in the main action on April 11, 2003. Docket No. 23.

ingly, the Court granted Charouhis's motion to withdraw, and ultimately dismissed the claims brought by Ruiz and the Association for failure to prosecute. Docket Nos. 27, 29. On May 19, 2003, Rodriguez alone filed an Amended Complaint reasserting the same claims that he had asserted in the original complaint against Integra Resort Management, Inc. and Enclave Resort Hotel, LLC d/b/a the Enclave. Docket No. 30. Rodriguez's Amended Complaint asserted no claim against the defendant in the consolidated case, The Enclave at Orlando Condominium Association, Inc.

Defendants Integra and Enclave answered on June 10, 2003. Docket No. 36. Defendants deny (as without knowledge) Rodriguez's allegation [in the Amended Complaint, Docket No. 30 at 2, Paragraph 3] that Rodriguez attempted to access and use the hotel premises, that Rodriguez was discriminated against and excluded, and that Rodriguez intends to use the hotel premises in the future. Docket No. 36 at 1. Defendants assert five affirmative defenses. The First Affirmative Defense is failure to state a claim. The Second Affirmative Defense is that—presuming the applicability of the ADA—the physical areas of the premises are in compliance, and all "readily achievable" architectural barriers have been removed; and that defendants are financially unable to make the modifications demanded except over a seven to ten year period or during remodeling. Docket No. 36 at 3.

The Third Affirmative Defense denies that Rodriguez has standing to bring this action, particularly as to alleged barriers that do not affect him (e.g., Rodriguez is not sight-impaired). Docket No. 36 at 3. As a Fourth Affirmative Defense, defendants reassert that:

Plaintiffs have [sic] brought this action in bad faith, without adequate factual basis and/or investigation, and without prior request or demand or any sort. The action has moreover been brought for improper purposes, including but not limited to the harassment of the Defendants and for the recovery of otherwise needless attorneys' fees, expenses and costs.

Docket No. 36 at 3. The Fifth Affirmative Defense is failure to join indispensable parties—the other owners of the common areas and rooms for which modification is demanded. Defendants demand attorneys fees pursuant to 42 U.S.C. § 12205 and 28 C.F. R. § 36.505 and Fed.R.Civ.P. 11, costs, and expenses. Docket No. 36 at 4.

**F. Settlement of the Second Lawsuit**

At the Preliminary Pretrial Conference on June 10, 2003, the parties announced that they had resolved by agreement Consolidated Case No. 6:03–cv–264–Orl–31JGG against the Enclave at Orlando Condominium Association, Inc. Docket No. 37. The mediation of the primary case against Integra and Enclave [Case No. 6:02–cv–917–Orl–31JGG], however, resulted in an impasse. Docket No. 40.

On June 24, 2003, Rodriguez then moved to again amend his complaint in the primary case to add Steven Brother as a plaintiff, and to add as a defendant The Enclave at Orlando Condominium Association, Inc.—the same condominium association that had supposedly settled Case No. 6:03–cv–264–Orl–31JGG. Docket No. 41. The proposed Second Amended Complaint (signed by Charouhis) contends that Brother also "attempted to access and use the subject premises in the past ...", and "intends to gain access into and use the premises and the facilities thereof in the future ..." R. 41 at 6. Integra and Enclave opposed adding new parties after discovery had closed, after mediation had been held, after Charouhis had dismissed the condominium association from the consolidated cases, and after the case had

been noticed [Docket No. 43] for trial on a date certain on November 3, 2003. Docket No. 44. The Court denied the late motion for leave to amend. Docket Nos. 45, 46.

### G. Joint Pretrial Statement

On September 25, 2003, the parties filed a joint pretrial statement. Docket Nos. 47—49. The parties stipulated that the Court had subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1343 for the claims arising under 42 U.S.C. §§ 12181 et seq. based on alleged violations of Title III of the ADA. In the pretrial statement, Rodriguez reasserted the list of claimed violations in the amended complaint. Docket No. 47 at 1–3. Integra and Enclave denied Rodriguez' operative allegations, and reasserted three affirmative defenses: 1.) Rodriguez has no standing to assert his claims; 2.) Integra and Enclave do not own the common areas; and 3.) Rodriguez's claimed ADA violations either are not architectural barriers or their removal is not readily achievable. Docket No. 47 at 3.

Although the parties could agree on only one uncontested fact (that Integra and Enclave were foreign entities authorized to transact business in Florida), several issues of fact remained for trial. See Docket No. 47 at 6—7. Whether Rodriguez in fact intended to return to the defendants' premises, however, was not listed. The parties agreed that Title III of the ADA required public accommodations to remove architectural barriers where such removal is readily achievable, but disputed whether defendants' premises (consisting of individual condominium units) must comply, and if so, to what extent and when. Docket No. 47 at 7—8. With respect to attorneys' fees and experts' fees, the parties stated:

> Plaintiffs estimate that to date allowable attorneys' and expert's fees, litigation expenses and costs are approximately $30,000. Plaintiff will seek an award

from Defendants for all attorneys' and expert's fees, plus an appropriate multiplier, and all litigation expenses and costs incurred in this matter. Defendants contest whether Plaintiff is entitled to fees and contest the amount and reasonableness of the fees charged.

Docket No. 47 at 8.

At the final pretrial conference on October 21, 2003, Judge Presnell informed the parties that he will try only liability issues at the bench trial on November 3, 2003, and that attorneys fees will be reserved for a later hearing if necessary. Docket No. 54. Rodriguez filed proposed findings of fact and conclusions of law. Docket No. 55. Rodriguez proposed a 17–page list of ADA violations that Rodriguez "will continue to suffer" [Docket No. 55 at 1] absent injunctive relief pertaining to parking; initial access into the building; the lobby area check-in desk; public telephones; doors; men's and women's restrooms and showers in the ballroom area and indoor pool area; fitness center; guest laundry; food court; outdoor patio; three pools; gazebo; drinking fountains; guest rooms; meeting rooms; and gift shop. Rodriguez proposed no further finding as to his intent to return to the property.

### H. The Settlement of the Primary Case

On November 3, 2003, the parties filed a joint notice of settlement, and asked the Court to administratively close the case "for a period of thirty (30) days" under Local Rule 3.08(b) to allow the parties to circulate, sign, and file a consent decree. Docket No. 56. Judge Presnell immediately dismissed and closed the case pursuant to Local Rule 3.08(b), without prejudice to the any party's right to move within 60 days to enter a stipulated form of final order or judgment, or to reopen

the case for further proceedings on a showing of good cause. Docket No. 57.

## I. The Third Lawsuit

Meanwhile—two weeks before filing the final pretrial statement in the two consolidated cases—Charouhis filed yet another lawsuit against The Enclave at Orlando Condominium Association, Inc. on September 8, 2003. *See Disability Advocates and Counseling Group, Inc., Jorge Luis Rodriguez, and Steven Brother v. The Enclave at Orlando Condominium Association, Inc.*, Case No. 6:03–cv–1294–Orl–22DAB [later assigned Case No. 6:03–cv–1294–Orl–31JGG]. In the complaint, Plaintiffs Rodriguez, Disabled Advocates and Counseling Group, Inc. [the "Advocates"], and Steven Brother, allege that the condominium association "is the owner, lessee, lessor and/or operator of the real property and improvements which are the subject of this action, located at 6165 Carrier Drive, Orlando, FL, commonly referred to as The Enclave (the 'building' or 'premises')." Case No. 6:03–cv–1294, Docket No. 1 at 3. The complaint accuses the condominium association of numerous violations of the ADA. Case No. 6:03–cv–1294, Docket No. 1 at 2—10. Although Charouhis certified the newly-filed case as related to the primary case [Case No. 6:02–cv–917], he did not name Integra or Enclave in the new complaint, or as a party with an interest in the outcome of the new case. *See* Case No. 6:03–cv–1294, Docket Nos. 4, 6.

Disabled Advocates and Counseling Group, Inc. asserts that it is a "non-profit" corporation, whose purpose is to assure the accessibility of public accommodations for its members, and to provide speakers, seminars, counseling, information, aid, and donations for disability issues. The complaint alleges that the condominium association discriminated against the Advocates because of its association with its disabled members and their disability claims. Case No. 6:03–cv–1294, Docket No. 1 at 2. The Advocates group claims that discrimination by the condominium association has caused an "impairment" of the Advocate's time and money. Case No. 6:03–cv–1294, Docket No. 1 at 2.

The complaint also alleges that Plaintiffs Jorge Luis Rodriguez and Steven Brother are individuals with disabilities who are members of the Advocates group. Case No. 6:03–cv–1294, Docket No. 1 at 3. According to the complaint, Rodriguez and Brother both attempted to access and use the premises, but were "discriminated against and excluded from proper unobstructed access to and use" by "barriers to access" resulting from ADA violations. Case No. 6:03–cv–1294, Docket No. 1 at 2—3. The complaint further claims that both Rodriguez and Brother intend to return to the hotel in the future:

> The Advocates members, and the individual Plaintiffs, intend to gain access into and use the premises and the facilities thereof in the future, as members of the able-bodied community are presently able to do, but have been and will continue to be denied such access and use as a result of Defendant's failure to remove barriers to access and comply with the ADA as set forth herein and are at serious risk of suffering further and irreparable injury without the relief requested herein.

Case No. 6:03–cv–1294, Docket No. 1 at 3. Plaintiffs demand that the Court issue a permanent injunction against continuing the discriminatory practices; order the defendants to modify the premises; order the hotel closed until the requisite modifications have been completed; and award attorneys fees, costs, and litigation expenses pursuant to 42 U.S.C. § 12205. Case No. 6:03–cv–1294, Docket No. 1 at 10.

## J. The Second Consolidation and Entry of Consent Decree

On November 25, 2003, the parties moved to consolidate the newly-filed third

case [Case No. 6:03–cv–1294–31JGG] with these now-closed cases [Consolidated Case Nos. 6:02–cv–917–Orl–31JGG and 6:03–cv–264–Orl–31JGG]. Docket No. 58. In the joint motion, the parties also asked the Court to approve their global consent decree, Docket No. 59, and to enter a stipulated final order retaining jurisdiction. Docket No. 58.

In the consent decree, defendants agree to a 40–page list of alterations and improvements that they must make to their property by May 31, 2004. Docket No. 59 at 3—43. Defendants agree to pay Rodriguez and Brother $250 each for reimbursement of administrative expenses, costs, and damages. Docket No. 59 at 46. Defendants also agree to pay plaintiffs' counsel, William Charouhis & Associates, P.A. "reasonable attorneys' fees, litigation expenses and costs incurred in this matter, and Plaintiffs' expert for reasonable expert fees and costs incurred in this matter." Docket No. 59 at 45. If counsel are unable to agree on fees and expenses in a separate letter agreement, the amount to be paid is to be determined by the Court. *Id.* According to the consent decree, Charouhis intends to seek an enhancement and/or multiplier of the attorneys' and expert's fees in the event that a hearing or judicial determination is required to determine the fees. Docket No. 59 at 45. Lastly, the parties ask the Court to refer the consolidated matters to the assigned magistrate judge for determination and entry of final judgment on attorneys fees, litigation expenses, and costs. Docket No. 58 at 3.

By order of December 3, 2003, Judge Presnell granted the joint motion to consolidate; entered a final order approving the consent decree; ordered compliance; retained jurisdiction to enforce the decree and award fees and expenses; and referred the matter to the undersigned magistrate judge

for the sole purpose of determining the amount of attorneys' fees, litigation expenses (including expert fees and costs) and costs to be awarded Plaintiffs' counsel in these matters as set forth in the Consent Decree and for entry of a final judgment thereon [sic] favor of Plaintiffs' counsel and against Defendants, jointly and severally, pursuant to 28 U.S.C. § 636(c).

Docket No. 60 at 2. No party asked Judge Presnell to make a finding as to whether any plaintiff intended ever to return to the property, and he made no such finding. Moreover, Judge Presnell's reference was limited to a sole purpose that did not expressly include the evaluation of standing and jurisdiction to enter a judgment for attorney's fees.

## IV. *APPLICATION*

### A. ATTORNEY'S FEES, LITIGATION EXPENSES, AND COSTS

#### 1. *The Basis for the Original Decision*

Charouhis and several of his clients come to the United States District Court for the Middle District of Florida without the normal presumption of integrity. Only a small part of this Court's experience with Charouhis and his clients is recorded in the written decisions described above. Having had the benefit of a full bench trial, Judge Presnell was able to express in his "Cottage Industry" decision what other judges had experienced in ADA Title III litigation over time.

Charouhis and Rodriguez commenced both this case and the "Cottage Industry" case simultaneously. Both cases involved the same Plaintiffs, the same Plaintiffs' attorneys, the same expert witness, the same presiding district judge, and largely the same issues in different hotels. Two days after Judge Presnell issued his widely-circulated "Cottage Industry" decision, the undersigned issued a cursory order

that denied Charouhis's demand for $147,366.54 as "entirely unreasonable," and allowed only those fees conceded by defendants. The reasons stated by Judge Presnell provide the missing rationale.

In the "Cottage Industry" decision, Judge Presnell described the explosion of private ADA-related litigation, including hundreds of Title III cases filed in this Court in recent years by a small number of litigants. He explained how the ADA lawsuit binge is driven by the economics of attorney's fees. Noting that the ADA lawsuit before him achieved nothing that could not have been accomplished by agreement, Judge Presnell proposed that no fees be awarded absent an attempt at pre-suit voluntary compliance. As usual, Charouhis had given no warning before rapidly filing his lawsuits, and had made no offer to forbear while remedial measures were undertaken. In 27 of the 75 cases in which Charouhis was counsel, Judge Presnell noted that this Court had to issue 33 show cause orders for Charouhis's failure to abide by the Court's orders.

Rodriguez's testimony at trial left Judge Presnell with the distinct impression that Rodriguez was "merely a professional pawn in an ongoing scheme to bilk attorney's fees from the Defendant." Rodriguez was unemployed, yet had filed almost 200 ADA lawsuits against various establishments, mostly while represented by Charouhis. Rodriguez was "evasive and willfully ignorant, and totally lacking credibility." According to Judge Presnell, Rodriguez's explanation for his initial visit to the facility disingenuous, as well as his explanation for his subsequent reservation; Rodriguez did not convey any honest desire to return there; Rodriguez relied on an inapplicable legal theory to argue that the defendant was engaging in unlawful discrimination; and Rodriguez had failed to establish that the defendant had subjected him to any discrimination in regard to the facility. Furthermore, Judge Presnell found that Ricci's expert report was "exaggerated and misleading;" that Ricci criticized access to a non-existent tennis court and to non-existent handrails and grab bars; that the photos attached to Ricci's report could not be matched to the violation being alleged; and that there was no basis in the evidence for other expert opinions expressed by Ricci.

Judge Spaulding also encountered problems involving integrity. As previously described in greater detail, Judge Spaulding found that Charouhis, Rodriguez, Ruiz, and the Association for Disabled Americans had made a false statement to the court about settlement. Judge Spaulding had to reduce the hourly rate claimed by Charouhis to $225 and for Barkus to $170, had to eliminate the expert fee entirely, and had to disallow some 60 hours for work that was not awardable, duplicative, unsuccessful, unnecessary, or incurred without first attempting to resolve the matter with opposing counsel. Furthermore, Judge Moody concluded that a disabled tourist living in Miami lacked standing to sue a hotel located hundreds of miles away in Clearwater, Florida.

On remand, this Court has the benefit of more recent cases that confirm the correctness of Judge Presnell's concerns in the "Cottage Industry" decision—concerns about fee-driven litigation, about professional plaintiffs and experts who lack credibility, and about the absence of standing. Following a bench trial, Judge Martinez refused to credit Brother's hollow testimony about intending to return to the hotel, and found that Brother lacked standing to complain about purely speculative injuries arising from alleged barriers in a hotel at which he had never stayed. In view of Brother's extensive litigation history, Judge Conway found Brother's professed intent to return to a hotel insufficient to satisfy Article III's standing requirement,

noting that Brother's family lives on social security checks and food stamps totaling $1,600 per month, yet Brother has professed an intent to return to all fifty-four of the properties he has sued. Judge Conway expressed alarm about vexatious shotgun litigation tactics, noting that attorney's fees have become more important and desirable than the ADA's goal of accessibility for the disabled. She called for a legislative solution.

Judge Klein echoed the alarm about attorneys fees fueling protracted litigation and discouraging settlement. He found that the facts contradicted Charouhis's assertion that his firm was one of the most "well respected ADA plaintiff's firm in this jurisdiction;" noted Judge Moreno's reduction of Charouhis's fees due to unreasonable conduct; found unjustified failures to appear, equivocation, and an explanation that was "disingenuous, contrived, and in bad faith;" determined that much of the delay his case was attributable to Charouhis; determined that many of the hours expended by Chaouhis and Barkus were "unnecessary, redundant, and duplicative;" determined that the time records were "replete with unnecessary work and duplication" too numerous to detail, and that the hours claimed for the fee application were "totally disproportionate and grossly inflated;" and concluded that Charouhis could have achieved the same result much more efficiently and far less expensively, and that the litigation had little or no benefit to the client.

Finding that Brother's affidavit on intent to return "lacked credibility," Judge Bucklew also found that Brother lacked standing to assert an ADA claim against a hotel. After Judge Moody had stayed proceedings in an ADA Title III case (not involving Charouhis) pending remediation of the alleged barriers, he then exercised his discretion under 42 U.S.C. § 12205 not to award attorney's fees "for prosecuting a lawsuit when a pre-suit letter to the defendant would have achieved the same result." Judge Jones found insufficient a plaintiff's bald assertion that he planned to return to an Ocala hotel, and that plaintiffs had not alleged a real and immediate threat of future injury which would be addressed through an injunction.

After Judge Presnell published his findings as to the unreliability of Ricci's expert report, another judge encountered the same problem. Judge Martinez found that Ricci's expert report was "based on misinformation and lack of information"; "confusing and difficult to follow"; "based on assumptions and omissions of relevant information"; and such an unreliable assessment of the facility that it did little to assist the plaintiffs in establishing their prima facie case. Indeed, hotel owners in other cases have asked this Court to bar Ricci from inspecting their hotels because Ricci is a registered sex offender who has been convicted of attempted sexual battery on a victim under age of 12. Charouhis and Brother were not candid with this Court about Ricci's conviction. *See e.g., Steven Brother v. Bray & Gillespie,* Case No. 6:03–cv–813–Orl–28DAB, Docket Nos. 20, 23; *Steven Brother v. Bray & Gillespie Delaware III,* Case No. 6:03–cv–978–Orl–19JGG, Docket No. 16, 17.

In short, neither Charouhis nor Rodriguez nor Brother have a record of integrity with this Court—quite the opposite. Although sworn, this Court has absolutely no confidence in the accuracy of the Verified Application [Docket No. 61] for attorneys fees and expenses filed by Charouhis, Rodriguez, and Brother, or in Charouhis's supporting "Pre–Bill Worksheets."

Moreover, Congress had laudable purposes for the ADA. Congress did not mandate an award of fees, but rather provided that the Court *"in its discretion may* allow the prevailing party ... a *reasonable* attorney's fee, including litigation expenses

and costs." 42 U.S.C. § 12205 (italics supplied). Congress would never have intended for a court to grant $147,366.34 to a professional pawn in an ongoing scheme to bilk attorney's fees from hotel owners, particularly where a pre-suit letter to the hotel owners would have achieved the same result as multiple consolidated lawsuits.[18] This Court would exercise its discretion under 42 U.S.C. § 12205 to award no attorney's fee, no litigation expenses, and no costs. Defendants Integra and Enclave, however, concede that $20,686.30 is "reasonable" for attorney's fees and expenses owed under the settlement agreement.

## 2. *The Hourly Rate Calculations*

On December 16, 2003, Rodriguez, Brother, and Advocates filed a verified application for a final judgment seeking attorneys' fees, expert fees, litigation expenses, and costs against Integra, Enclave, and the condominium association, jointly and severally. Docket No. 61. Charouhis states that his fees, litigation expenses, and costs are contingent upon an award. Docket No. 61 at 5. According to the verified application, defendants have consented in writing to pay Charouhis a reasonable attorneys' fees, litigation expenses, and costs [Docket No. 59 at 45], and the sole issue that remains is the amount that is reasonable. Docket No. 61 at 3. Charouhis seeks a total of $147,366.34 as follows:

| | | |
|---|---|---|
| Attorneys' Fees | $ 120,762.00 | |
| Attorneys' Costs | 2,850.59 | |
| Expert's Fees | 15,401.25 | |
| Expert's Costs | 277.50 | |
| Expert Witnesses' Fees for Evidentiary Hearing | 2,625.00 | (estimate) |
| Attorneys' Fees for Evidentiary Hearing | 3,600.00 | (estimate) |
| Expert's Fees for Evidentiary Hearing | + 1,850.00 | (estimate) |
| | | |
| TOTAL | $ 147,366.34 | |

Docket No. 61 at 21. The following sections of this decision discuss Charouhis's attempts to justify this total, and Defendants' responses.

Defendants Integra and Enclave do not dispute that the Plaintiffs are entitled to a *reasonable* attorney's fee, and to recover of some costs and a reasonable expert fee. However, Defendants argue that the fee request of $147,366.34 is grossly inflated, that it is "a calculated attempt to intimidate the Defendants into paying Plaintiffs more than they are entitled to under the law," and that the Plaintiffs are also seeking unrecoverable costs and an expert fee is too high. Docket No. 69 at 1, 15. This Court agrees with Defendants.

### a. Charouhis's and Barkus's Fees

Charouhis alleges that he incurred $52,129 ($50,177 + $1,952) in attorney's fees on behalf of the Plaintiffs in "these consolidated matters":

| Timekeeper | Hours | Rate | Total |
|---|---|---|---|
| WNC | 16.2 | 325 | 5,265 |
| WNC | 77.5 | 360 | 27,900 |
| LIB | 48.8 | 170 | 8,296 |
| LIB | 53.4 | 190 | 10,146 |
| Paralegal | + 5.8 | 90 | + 522 |
| | | | |
| TOTAL | 201.7 | $ 258 average | $ 52,129 |

Docket No. 61 at 4. Charouhis certifies that his motion for fees and expenses is well-grounded, and asserts that "attached hereto are records which reflect the particular attorney and expert time, *or reduced portions thereof due to the exercise of proper billing judgment.*" Docket No. 61 at 5 (emphasis in original).

Charouhis' verified motion relies on supporting Exhibit 1-A, Charouhis' "Pre–Bill Worksheet" reflecting $50,177 in attorney's fees incurred in Case No. 6:02–cv–917–

---

18. The AMERICAN HERITAGE DICTIONARY, NEW COLLEGE EDITION (Houghton Mifflin Co.1981) defines "barratry" as the "offense of exciting or stirring up quarrels or groundless lawsuits."

"Champerty" is an "illegal sharing in the proceeds of a lawsuit by an outside party who has promoted it."

Orl–31JGG allegedly billable to Jorge Luis Rodriguez. Charouhis' verified motion also relies on supporting Exhibit 1–B, Charouhis' "Pre–Bill Worksheet" reflecting $1,952 in attorney's fees incurred in Case No. 6:03–cv–1294–Orl–31JGG allegedly billable to Disabled Advocates and Counseling Group, Inc. and Steven Brother. Docket No. 61 at 4, n. 2.

Daniel N. Brodersen, an attorney who states that he is familiar with ADA cases in Orange County, Florida, evaluated the services performed by Charouhis in the consolidated cases. He opined by affidavit that $53,672 (an amount $1,543 higher than the amount actually sought) would be a reasonable attorneys' fee for the attorneys' services in the consolidated cases. Docket No. 65 at 4. Based on the relative levels of skill and experience of Charouhis and Lori Barkus, Brodersen opined that the following hourly rates, hours expended, and total fees were reasonable for Orange County, Florida:

| Timekeeper | Hours | Rate | Total |
|---|---|---|---|
| WNC | 93.7 | $360 | $33,732 |
| LIB | 102.2 | 190 | 19,418 |
| Paralegal | + 5.8 | 90 | + 522 |
| TOTAL | 201.7 | | $53,672 |

Docket No. 65 at 4.

Defendants Integra and Enclave dispute as excessive the hourly rates used. Docket No. 69 at 4—6. Charouhis bills his time at an initial hourly rate of $325, which is increased in 2003 to $360. Lori Barkus, his associate, bills her time at an initial hourly rate of $170, which she increases 2003 to $190. Defendants are correct that these rates are excessive for the Middle District of Florida, the relevant legal community. *See Association for Disabled Americans, Inc. v. FCH/DT Leasing II,* Case No. 6:01–cv–377–Orl–28JGG, Docket No. 33 at 5 (October 21, 2002) ($250 for Charouhis; $170 for Barkus); *accord, Association for Disabled Americans, Inc. v. Naples Hotel Co.,* Case No. 2:01–cv–601–FtM–29DNF (March 26, 2003) (allowing $260 for Charouhis; $120 for Barkus); *Association for Disabled Americans, Inc. v. Lehill Partners,* Case No. 2:00–cv–320–FtM–29DNF; *Florida Gulf Coast Paralyzed Veterans Association, Inc. v. Martin Bowen,* Case No. 2:00–cv–349–FtM–29DNF. Indeed, the Honorable John Antoon most recently set a rate of $260 for Charouhis, $120 for Barkus, and $70 for paralegal Ward—for a total of fees and costs of $17,853.60. *See Brother v. Int'l Beach Club Condominium Ass'n,* Case No. 6:03–cv–444–Orl–28DAB, Docket Nos. 89, 90, 2005 WL 1139927 (May 13, 2005) (available on CM/ECF).

Defendants argue that the Court should reduce the amount ultimately awarded to Plaintiffs because they have improperly requested such an obviously inflated hourly rate. Docket No. 69 at 6. Although $360 per hour has been consistently rejected by the Middle District of Florida, Plaintiffs nevertheless sought a $360 rate in their motion. As intended, this served to increase the costs to the defendants in having to prepare a memorandum in response. In addition, Charouhis seeks fees for the time he spent preparing the portion of the application supporting his claim for $360. The Court agrees with defendants that this is, at least in part, a tactic to artificially increase the fee claim so as to scare or intimidate the Defendants into settling the fee claim.

Defendants Integra and Enclave also dispute as excessive the number of hours recorded and "pre-billed" by Charouhis and Barkus. Docket No. 69 at 4—6. Charouhis recorded 93.2 hours on this matter. Defendants asks the Court to deduct 46 hours from Chaouhis's time for the following reasons, and the Court concurs.

1. On May 29, 2002, Charouhis charged 4.80 hours to inspect the premises. Had he used a competent expert who was not a felon, there would have been no reason for

Charouhis to drive to Orlando to personally observe the alleged violations. Therefore, 4.8 hours should be deducted from Charouhis' time.

2. On June 4, 2002, Charouhis charged 1.30 hours to investigate public records regarding Integra and Enclave. Charouhis nevertheless failed to name The Enclave at Orlando Condominium Association, Inc., the record owner of the common areas and parking lots, causing a procedural nightmare of related and consolidated cases. Charouhis charges another 0.20 hours on June 20, 2003 for research of other owners and operators of the property. Half of the 1.5 hours should be deducted from Charouhis' time.

3. On January 23, 2003, Charouhis charged 0.40 hours for drafting a Motion to Withdraw. Defendants should not have to pay because two of Charouhis's three clients fired him. Therefore 0.40 hours should be deducted from Charouhis' time.

4. On March 26, 2003, Charouhis charged 8.20 hours for attending a hearing on his Motion to Withdraw. Again, Defendants should not have to pay for Charouhis to attend a hearing on his motion to withdraw even though there was a very short discussion after the hearing between counsel about settlement. That discussion could have been conducted by telephone, and certainly does not necessitate 8.20 hours. Therefore, 8.0 hours should be deducted from Charouhis's time.

5. On June 13, 2003, Charouhis charged 10.20 hours for attending a mediation conference. This apparently includes travel time because the mediation was less than 5.0 hours long. There is no justification for shifting the burden of travel expense for Plaintiffs' choice of counsel. *Association for Disabled Americans, Inc. v. Red Roof Inns,* Case No. 6:98–cv–1199–Orl–3ABF (April 21, 2000). There is no credible evidence that Charouhis actually worked on this case during his travel time.

Therefore 5.0 hours should be deducted from Charouhis' time.

6. On September 11, 2003, Charouhis charged 9.70 hours for attending the pretrial attorney's meeting. This includes significant travel time because the meeting was less than 1.0 hour long. Defendants should not have to pay $3,500 for Charouhis to attend a one-hour meeting. Therefore 7.70 hours should be deducted from Charouhis' time.

7. On September 27, 2003, Charouhis charged 7.80 hours for preparing for trial. The next day, he claims to have spent another 7.20 hours preparing for trial. Trial was not scheduled until November 2003. Further, the parties were still engaged in settlement discussions, and Title III cases almost always settle. This Court has no confidence that Charouhis actually spent two days preparing for a potential one-day trial in November. Therefore 10.0 hours should be deducted from Charouhis' time.

8. On November 9 and 11, 2003, Charouhis charged a total of 1.50 hours for reviewing the executed Consent Decree and meeting with his client to get the Consent Decree executed. This is excessive. One hour should be deducted from Charouhis' time.

9. On November 7, 10, and December 8, 2003, Charouhis spent a total of 5.9 hours preparing the Application for Attorneys Fees, Costs and Expert Fees. This is excessive, and most of it should not be charged to Defendants. The bulk of the Motion and Memorandum of Law is standard language that this Court has seen from Charouhis in previous cases. The bulk of the motion reviews entitlement to fees (which was never contested), the multiplier (which should never have been part of the motion) and the hourly rate (which is clearly excessive and should never have been charged). The Court agrees that

should not have to pay Charouhis for his time in preparing the motion. Therefore 5.9 hours should be deducted from Charouhis' time.

10. From September 4, 2003 through December 3, 2003, Charouhis billed 3.5 hours on the second lawsuit filed by his clients against the condominium association. That lawsuit was only "necessary" because Charouhis had mistakenly omitted that owner from the first lawsuit, and had not timely moved to include it. This time should not be charged to Integra and Enclave, so 2.5 hours should be deducted from Charouhis' time.

Charouhis asserts in his time records that his associate, Lori Barkus, spent 102.2 hours on this matter. The Court agrees with Defendants that 52.6 hours should be deducted from Barkus' time.

1. On June 14, 2002, Barkus charged 2.10 hours to draft the complaint. The Plaintiffs have filed over 200 cases and most of the language in the complaint is standard boiler plate language. This could have been accomplished in one hour, so 1.10 hours should be deducted from Barkus' time.

2. From September 5 through September 23, 2002, Barkus charged 4.6 hours to arrange for the inspection of the property, review the certificate of interested persons, the notice of pendency of other actions, and revise a case management report that she had already spent over one hour preparing. This is excessive, and 2.5 hours should be reduced from Barkus' time.

3. On October 2, 2002, Barkus charged 1.9 hours to draft standard form interrogatories and requests to produce. This time is excessive, and 0.9 hours should be deducted from Barkus' time.

4. On October 23, 2002, Barkus charged 12.50 hours to attend the inspection and discuss settlement. This clearly includes significant travel time because the inspection was only about 2.0 hours long. There are plenty of qualified attorneys in the central Florida area to handle these types of claims. Plaintiffs are free to choose attorneys in Miami, but Defendants should not have to pay $2,125 for Barkus to observe an inspection. Therefore 10.00 hours are deducted from Barkus time.

5. From October 24 through October 30, 2002, Barkus spent 17.4 hours preparing the proposed Stipulation and Settlement Agreement. She also spent an additional 2.10 hours on November 27, 2002 further revising this agreement. Most of the language is standard language contained in all of Plaintiffs settlement agreements. Therefore 10.00 hours should be deducted from Barkus' time.

6. On February 28, 2003, Barkus spent 5.10 hours preparing responses to Defendant's interrogatories and requests to produce. She had already spent 1.40 hours on December 11, 2002 reviewing the Defendants' requests and the interrogatories. The responses merely referred to the expert report, and stated that Rodriquez was "without knowledge." It likely took far less time to prepare this response. Therefore 3.50 hours should be deducted from Barkus' time.

7. On April 14, 2003, Barkus charged 1.1 0 hours to prepare a Motion to Compel Production of documents and answers to interrogatories. This document was unnecessary, was never filed, and Defendants should not be charged for its preparation. Therefore 1.10 hours should be deducted from Barkus' time.

8. On June 20, 2003, Barkus charged 1.40 hours to draft a motion for leave to amend the complaint and amended complaint. On June 20, 2003, Barkus charged 0.30 hours to revise these documents. The motion was clearly untimely, and was therefore denied. The Defendants should

not have to pay for the time spent on this motion. The 1.70 hours should be deducted from Barkus' time.

9. On July 21, 2003, Barkus charged 0.90 hours for time spent on issues relating to the motion to amend the complaint. Again, this motion was clearly untimely and was ultimately denied. Therefore, the Defendants should not have to pay for any of her time spent on this motion. The 0.90 hours should be deducted from Barkus' time.

10. On August 11, 2003, and September 4 and 5, 2003, Barkus spent a total of 2.4 hours drafting the pretrial statement. Much of the language in the statement was standard language used by Plaintiffs in previous litigation. It should not have taken 2.4 hours to draft this document. At least 1.4 hours should be deducted from Barkus' time.

11. On October 17, 18 and 20, 2003, Barkus spent 7.0 hours drafting the trial brief and witness and exhibit lists. Much of the language in these documents is standard language used by Plaintiffs in numerous prior lawsuits. At least 3.0 hours should be deducted from Barkus' time.

12. On October 21, 2003, Barkus charged 9.10 hours to attend the pre-trial conference. This includes significant travel time because the conference lasted only about 0.5 hours. Defendants should not have to pay $1,700 for Barkus to attend a one-half hour hearing—essentially funding plaintiffs' choice of out-of-district counsel. Therefore 8.0 hours should be deducted from Barkus' time.

13. On October 23, 2003, Barkus charged another 2.5 hours to revise the exhibit and witness list and the trial brief. The 2.5 hours is excessive when added to the prior time spent on these documents, and should be deducted from Barkus' time.

14. From July 12 through October 7, 2003, Barkus spent 3.5 hours working on the second lawsuit against the condominium association. This work was the result of Charouhis's oversight, and 2.5 hours should be deducted from Barkus' time.

b. **Charouhis's Litigation Expenses and Costs**

Charouhis alleges that he incurred $2,850.59 ($2,544.87 + $305.72) in "attorney's litigation expenses and costs" in these consolidated matters. Docket No. 61 at 4. Supporting Exhibit 1–A of Charouhis' "Pre–Bill Worksheet" reflects $2,544.87 in litigation costs and expenses incurred in Case No. 6:02–cv–917–Orl–31JGG allegedly billable to Jorge Luis Rodriguez. Supporting Exhibit 1–B of Charouhis' "Pre–Bill Worksheet" reflects $305.72 in litigation costs and expenses incurred in Case No. 6:03–cv–1294–Orl–31JGG allegedly billable to Disabled Advocates and Counseling Group, Inc. and Steven Brother. Docket No. 61 at 4, n. 2. Charouhis' "Pre–Bill Worksheets" [Exhibits 1–A and 1–B] reflect charges for public records searches, photocopies, court filing fees, service of process, facsimiles, postage, telephone, car rental, mileage, tolls, parking, meals during inspection and Court appearances, UPS, computer legal research, airline tickets, and charges for determining reasonable expert fees and attorneys fees.

Defendants Integra and Enclave concede [Docket No. 69 at 13] that Plaintiffs are entitled to recover the following costs and expenses:

| | |
|---|---:|
| Filing fee | $150 |
| Service of Process | 90 |
| Filing fee (second case) | 150 |
| Service of Process | 45 |
| Total | $435 |

Defendants correctly argue [Docket No. 69 at 13—14], however, that the remaining costs sought should not be recoverable because they are overhead of Charouhis's law firm—such as postage (billed per

month), photocopy charges (billed per month), express mail, long distance telephone charges (billed per month), and facsimile charges. The other costs are for tolls, plane fare, shuttle fare, mileage expenses, food and other costs of travel. Again, there is no justification for shifting the burden of travel expenses to the Defendants due to the choice of Plaintiff to retain counsel from an area outside of the Middle District of Florida.

The mediation fee is not normally awarded as a cost, but rather is typically split between the parties. The charges for Herbert Neff ($125) and Daniel Brodersen, Esq. ($150) are not recoverable because those affidavits were ineffective in obtaining the excessive rates claimed.

### c. Ricci's Expert Fees and Costs

Charouhis claims $6,845 (37 hours at $185 per hour) in expert fees in these consolidated matters, plus $242.88 in expert costs. Docket No. 61 at 4. The verified motion attaches an invoice for $7,087.88 in inspection and research services (37 hours at $185 per hour, plus $242.88 photograph expense) by Accessibility Disability Consultants in Margate, Florida. Docket No. 61, Exhibit 2. The verified motion also attaches a resume of Thomas J. Ricci of Pomano Beach, Florida, a principal of Accessibility Disability Consultants, as well as a letter from Ricci to Charouhis enclosing a 47–page report (plus 62 pages of photographs) of his ADA inspection of the Enclave Hotel. Docket No. 61, Exhibits 14—15. Herbert Neff, a Florida general contractor who states that he is familiar with the ADA, filed a declaration that Ricci's rate of $185 per hour, Ricci's expenditure of 37 hours, and Ricci's total fee of $6,845 are reasonable. Docket No. 63.

Defendants contest neither Ricci's ADA expertise, nor his $185 per hour rate. Docket No. 69 at 14. Defendants, however-

er, argue that Ricci's 37 hours allegedly spent on this case result in an excessive fee. Docket No. 69 at 14—15. The Court agrees with defendants as to the excessive fee.

First, Ricci allegedly spent over 13 hours conducting the initial review of the facility. However, the inspection lasted less than two hours. The rest of his time must be travel time. There are surely far more competent ADA experts in the Orlando area, and Defendants should not have to pay Mr. Ricci $185 per hour just to drive his car. Therefore 11 hours should be deducted from his time.

Second, Ricci's time records indicate that he spent 22.5 hours over a three-day period preparing the report. The report is dated November 1, 2002, yet he claims he spent 14.5 hours after the date of the report making additional changes. The claimed time spent is suspect and excessive.

Ricci prepares dozens of these reports a year. Although bulky, the report contains page after page of standard language and pictures. In many cases, the violations listed for a room or an area are exact duplicates of the violations listed for other rooms and areas in the hotel. Ricci has exaggerated the number of hours spent on preparing this report. As requested by defendants, an additional 8 hours should be deducted from Ricci's time. Therefore, Ricci should paid only the amount uncontested by defendants—18 hours to inspect the premises and prepare the report.

In addition, Ricci's invoice charges a photographic expense of $0.22 per copy for 1,104 pictures. However, Ricci was not at the facility long enough to take 1,104 pictures. This would have required him to take approximately 10 pictures per minute. In addition, his report only attaches 53 pages of pictures with six or fewer pictures per page. Therefore, there are less than

315 pictures attached to the report, not 1,104. Defendants should not have to pay for pictures that were unnecessary or duplicative. Therefore, the cost entry on Ricci's invoice should be reduced from $242.88 to $69.30.

### d. Estimated Future Attorney's Fees for Charouhis and Expert Fees for Ricci

Charouhis estimates that he will incur, and also seeks an award for:

> approximately $2,625.00 for the attorneys' and expert's [sic] witnesses to prepare for and appear an [sic] evidentiary hearing on this matter if necessary; and approximately $3,600.00 in Plaintiff's attorney time (10.0 hours at $360.00) and $1,850 in Plaintiff's expert's time (10.0 hours at $185.00 per hour) to prepare for an appear an [sic] evidentiary hearing if necessary.

Docket No. 61 at 4. The Court did not conduct an evidentiary hearing in this case, so the Court need not consider estimated future fees.

### e. Multiplier for Charouhis's Attorney's Fees and Ricci's Expert Fees

Charouhis also argues that a 2.25–times upward adjustment or multiplier of both his attorneys' fees and his expert fees is necessary to bring his fees within the range that would attract competent counsel. Docket No. 61 at 13, 15. According to Charouhis, the 2.25 multiplier is required due to:

> the greater than normal financial risk of non-payment resulting from payment being contingent upon the success of the action and payment by the Defendants; counsel and the expert bearing the risk of non-payment, not the clients; the exceptional results obtained; and, the de-

lay in payment incurred by counsel and the expert.

Docket No. 61 at 5. Specifically, Charouhis seeks enhanced attorneys' fees of $120,762 ($53,672 × 2.25). Docket No. 61 at 14—15.

Charouhis, however, erroneously multiplies Brodersen's estimate of a reasonable fee ($53,672) instead of the lower fee that Charouhis actually claims in his "Pre–Bill Worksheets" ($50,177 + $1,952 = $52,129). *See* Docket No. 61, Exhibits 1–A and 1–B. Brodersen had used the highest billing rates ($360 for Charouhis and $190 for Barkus) even though those attorneys had billed some hours at lower billing rates ($325 for Charouhis and $170 for Barkus). Docket No. 61 at 4. The Court therefore presumes that Charouhis intended to seek adjusted attorneys' fees of $117,290.25 ($52,129 × 2.25). Charouhis also seeks enhanced expert fees of $15,401.25 ($6,845 × 2.25). Docket No. 61 at 14—15.

Defendants strongly contest Charouhis's claim for a multiplier, citing *City of Burlington v. Dague,* 505 U.S. 557, 561–67, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (typical fee-shifting federal statutes do not permit an attorney's fee award to be enhanced on account of a contingency fee agreement); *Association for Disabled Americans, Inc. v. Red Roof Inns,* Case No. 6:98–cv–1199–Orl–3ABF; *Association for Disabled Americans, Inc. v. Naples Hotel Co.,* Case No. 2:01–cv–601–FtM–29DNF; *Association for Disabled Americans, Inc. v. FCH/DT Leasing II,* 6:01–cv–377–Orl–28JGG. Docket No. 69 at 3—4. The Court agrees with Defendants.[19]

Plaintiffs did not obtain an exceptional result in this case, and are not entitled to a multiplier. The Court involuntarily dis-

---

**19.** Plaintiffs may have abandoned their claim for a multiplier on appeal in this case, 387 F.3d at 1243, but they have not done so in the district court.

missed all claims of two of the three original plaintiffs after they fired Charouhis. Charouhis then scrambled for replacement clients. Charouhis did not sue all of the owners of the facility until too late. He then scrambled to add the condominium association by filing an additional lawsuit, and then consolidating that lawsuit with the others. The tortured procedural history shows four lawsuits filed by seven revolving plaintiffs, two settlements, various dismissals, and one refiled suit as to the condominium association, and two consolidations—all in an effort to salvage some benefit from an inept or bungled litigation plan.[20] The Court should not apply a multiplier in this case.

Rather, the Court agrees with Defendants that the Court should actually *reduce* the amount awarded to Plaintiffs because their demand for a multiplier in this case is outrageous. The Plaintiffs' claim for a multiplier has been consistently rejected by this Court. Defendants are correct that Plaintiffs' demand served to unnecessarily increase the costs to the Defendants because they had to research and respond to his frivolous claim. As discussed separately, Charouhis also demands fees for the time he spent preparing his motion for fees and his demand for a multiplier. Charouhis should not profit from his tactic to artificially increase his fee—to use an excessive demand of $147,336.34 as a hammer to intimidate defendants into settling the fee claim, and for obtaining higher award than might be reasonable.

Defendants concede [Docket No. 69 at 17] that Plaintiffs are entitled to the following attorney's fees, expenses, and costs:

| | | |
|---|---|---|
| Total hours sought by Charouhis | | 93.7 |
| Less Deductions | | (46.0) |
| Total Hours | | 47.7 |
| x hourly rate | $ | 260 |
| Total due for Charouhis | $ | 12,402 |
| Total hours sought for Barkus | | 102.2 |
| Less Deductions | | (52.6) |
| Total hours | | 49.4 |
| x hourly rate | $ | 120 |
| Total due for Barkus: | $ | 5,928 |
| Total hours sought for Ward (no objection) | $ | 522 |
| TOTAL ATTORNEYS FEES: | $ | 18,852 |
| TOTAL COSTS | $ | $435 |
| RICCI'S EXPERT FEES (18 hours × $185) | $ | 3,330 |
| RICCI's COSTS | $ | 69.30 |
| GRAND TOTAL: | | $22,686.30 |
| LESS DEDUCTION FOR MAKING UNNECESSARY CLAIMS: | | ($ 2,000.00) |
| TOTAL ALLOWED | | $20,686.30 |

Although the Court would exercise its discretion to award nothing, the Defendants concede that $20,686.30 is reasonable. For the reasons stated in detail above, the Court concurs with Defendants.

## B. STANDING

This court is empowered to resolve only actual cases or controversies, and therefore has an obligation to assure itself that Rodriguez and Brother each have Article III standing at the outset of the litigation. Rodriguez and Brother lack standing to seek an injunction unless they allege facts giving rise to an inference that they each will suffer future discrimination by Integra and Enclave. Otherwise, the scarce resources of the federal courts are being devoted to a dispute in which Rodriguez and Brother have no concrete stake ... a case in which the threat of injury to Rodriguez and Brother is merely abstract, conjectural, or hypothetical, and not real and immediate. Similarly, this Court must assure itself that Disability Advocates and

---

**20.** Defendants are technically correct that the settlement did not include many of the significant modifications initially sought by the Plaintiff (such as the addition of numerous accessible rooms, modifications of ramps and deck areas, installation of pool lifts, and major structural modifications to create accessible paths of travel). But the main objective of this litigation was to obtain attorney's fees for Charouhis, and not for the individual plaintiffs to obtain remediation or their miniscule awards.

Counseling Group, Inc. has standing—i.e., that its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

The presiding judge in this case based his "Cottage Industry" decision in part on a finding that Rodriguez lacked standing. 305 F.Supp.2d at 1280, 1284—85. Two days later in this case, the undersigned therefore had the very same concern about granting fees to Rodriguez, but that concern remained unstated. Docket No. 71 at 2 (Case No. 6:02–cv–917–Orl–31JGG). The parties had settled this case without ever having raising the standing issue, and without ever having asked Judge Presnell to determine whether Rodriguez and Brother intended to return to the hotel. As jointly requested by the parties, the order of reference to the undersigned was limited to a sole purpose that did not include the evaluation of standing. Docket No. 60 at 2.

Nevertheless, instead of entering a cursory order and judgment granting only the amount of fees conceded by the Defendants, the undersigned should have raised the jurisdictional issue *sua sponte.* Before entering any judgment for fees and costs, the undersigned is obliged to bring the potential jurisdictional defect to the attention of the presiding district judge for resolution (or reference)—and does so now, albeit belatedly. In light of the standing cases cited above, Plaintiffs shall show cause in writing on or before September 1, 2005 why this case should not be dismissed for lack of subject matter jurisdiction.

## V. *CONCLUSION*

For the reasons stated above, this Court would exercise its discretion under 42 U.S.C. § 12205 to award no attorney's fee, no litigation expenses, and no costs. Defendants Integra and Enclave, however, concede that $20,686.30 is "reasonable" for attorney's fees and expenses owed under their settlement agreement, and they offer sensible reasons in support. If it turns out that the individual and corporate Plaintiffs in fact have standing to proceed, and that this Court has subject matter jurisdiction to enter a judgment, then this Court will again enter a judgment for $20,686.30.